**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| STANLEY JOSEPH THOMPSON, | : | CIVIL ACTION NO. |
| BOP Reg. # 59212-019, | : | 1:11-CV-2294-TWT-JSA |
| Movant, | : | |
| | : | CRIMINAL ACTION NO. |
| v. | : | 1:07-CR-138-TWT-JSA-2 |
| | : | |
| UNITED STATES OF AMERICA, | : | MOTION TO VACATE |
| Respondent. | : | 28 U.S.C. § 2255 |

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Movant has filed the following pleadings: (1) a motion to vacate his sentence under the authority of 28 U.S.C. § 2255 (Doc. 168); (2) a supplement to his motion to vacate combined with a motion for new trial (Doc. 171); (3) a supporting brief (Docs. 171-1, 171-2); (4) a motion to waive strict compliance and for liberal construction of his pleadings, with attached exhibits (Doc. 172); (5) two motions for extensions of time and two motions requesting the Court's attention (Docs. 175, 178-80); and (6) two replies (Docs. 181, 188) to the government's responses (Docs. 177, 187) to his § 2255 motion.

For the reasons set forth below, **IT IS RECOMMENDED** that the § 2255 motion be **DENIED** and that the other procedural motions that are pending be denied

as moot or otherwise resolved as explained further below.[1]

## I.   **Procedural History**

In a thirteen-count indictment, the government alleged that Movant and his co-defendant Leary Robinson "aided and abetted . . . each other" in committing the following twelve crimes:

1.   the February 8, 2007 armed robbery of a Taco Bell Restaurant, in violation of 18 U.S.C. § 1951 (the Hobbs Act) and 18 U.S.C. § 2;

2.   the knowing use and carry of a firearm, a handgun, "during and in relation to a

---

[1]       Prior to serving as a U.S. Magistrate Judge, the undersigned served as an Assistant U.S. Attorney in the same United States Attorney's Office ("USAO") that prosecuted Movant, from February 25, 2004 through June 1, 2012.  The undersigned served as deputy chief of the economic crime section of the USAO for some of that period.  The undersigned recalls no personal or supervisory involvement over defendant's case and this case was not one that would have come under the undersigned's supervisory responsibilities.

Although no request for recusal has been made, the undersigned will briefly explain why he has not recused *sua sponte*.  Title 18 U.S.C. § 455(b)(3) requires a judge who previously served in government to recuse only if the judge actually participated in the case.  *Mangum v. Hargett*, 67 F.3d 80, 83 (5th Cir. 1995).  In other words, "a judge is not subject to mandatory disqualification based on the mere fact that another lawyer in his prior government office served as an attorney on the matter."  *United States v. Champlin*,  388 F. Supp. 2d 1177, 1180 (D. Haw. 2005).  Several courts have held that "an Assistant United States Attorney is only disqualified from cases on which he or she actually participated."  *Id.* at 1181 (citing *United States v. Ruzzano*, 247 F.3d 688, 695 (7th Cir. 2001) ("As applied to judges who were formerly AUSAs, § 455(b)(3) requires some level of actual participation in a case to trigger disqualification."); *Mangum*, 67 F.3d at 83 (same); *Kendrick v. Carlson*, 995 F.2d 1440, 1444 (8th Cir. 1993) (same).  "[T]he same rule applies to former supervisors in the United States Attorney's office; § 455(b)(3) requires recusal only when the supervisor actually participated in a case."  *Champlin*, 388 F. Supp. 2d at 1181; *see also United States v. Scholl*, 166 F.3d 964, 977 (9th Cir. 1999); *United States v. Di Pasquale*, 864 F.2d 271, 279 (3d Cir. 1988).  As the undersigned was uninvolved in this case and otherwise perceives no ground for recusal, the Court does not *sua sponte* find that recusal is warranted.

crime of violence," i.e., the count 1 armed robbery, in violation of 18 U.S.C. §§ 924(c)(1)(A) & 2;

3.      the February 12, 2007 robbery of a Suntrust Bank, in violation of 18 U.S.C. §§ 2113(a) & 2;

4.-5.   the February 12, 2007 armed robbery of a Bank of America, in violation of 18 U.S.C. §§ 2113(a), (d) & 2, and a second firearm count;

6.-7.   the February 21, 2007 armed robbery of a Wachovia Bank, and a third firearm count;

8.-9.   the February 21, 2007 armed robbery of a Bank of America, and a fourth firearm count;

10.     the March 14, 2007 robbery of a Bank of America;

11.     the March 19, 2007 robbery of a Bank of America;

12.     the March 26, 2007 robbery of a Suntrust Bank.

(Doc. 11).

The government has summarized the factual and procedural history of this case as follows:

> During the month of February, 2007, [Movant] and his co-defendant Leary Robinson went on a robbing spree, robbing a Taco Bell and seven banks. Robinson was the one who usually went into the banks, four times with a gun, while [Movant] acted as getaway driver and demand note writer among other roles. In the Taco Bell robbery, Counts 1 and 2, both defendants were armed and both went into the store to commit the robbery. The robbery was videotaped and shown to the jury. This [was the] first robbery [and] occurred on February 8, 2007 . . . . The

3

rest of the armed and unarmed robberies were of federally insured banks.

On April 24, 2007 [Movant] and his co-defendant . . . were indicted by a federal grand jury for four counts of armed robbery, four counts of using a firearm during a crime of violence, and four counts of unarmed robbery . . . . Attorney Robert Lee Mack was appointed by the Magistrate Judge to represent [Movant]. The case against both defendants on all counts went to trial before a jury on February 26, 2008. The jury verdict was read on February 29, 2008, and [Movant] was found guilty on [all] Counts . . . . [except] 6 and 7. . . .

[Movant] was sentenced on June 23, 2008 as follows: on Counts 1, 3, 4, 8, 10, 11, and 12 [the robberies] to 135 months imprisonment . . ., all concurrent; on the 924(c) [firearm] charges: Count 2: 84 months consecutive to all counts, Count 5: 300 months consecutive to all counts, [and] Count 9: 300 months consecutive to all counts, for a total of 819 months [68 years and 3 months] . . . .

(Doc. 177 at 4-5 (citations omitted)).

The Eleventh Circuit stated the following with respect to the joint appeal filed by Movant and Robinson:[2]

After review of the record, we find that, at the time the Government rested its case-in-chief, there was sufficient evidence to support [Movant's] convictions on the firearms violations charged in counts five and nine. With respect to count five, a Bank of America teller testified during the Government's case-in-chief that she was robbed by Robinson on February 12, 2007, and that Robinson had a black gun

---

[2]The Eleventh Circuit noted that the defendants had moved for a judgment of acquittal only on firearm counts 2, 5, 7 and 9 and robbery counts 1 and 6, and not on robbery counts 3, 4, 8, 10, 11 and 12; that they had argued insufficiency of the evidence only on the firearm counts and robbery count 6; and that they had been acquitted of counts 6 and 7. (Doc. 167 at 5-7).

4

during the robbery. With respect to count nine, a different Bank of America teller testified that he was robbed on February 21, 2007. That teller identified Robinson as the robber and said that, during the robbery, Robinson had pulled a black gun that "looked like a Glock" out of a folder and pointed it at the teller. Photos introduced during the teller's testimony depict Robinson, pointing a gun at the teller. Robinson gave a statement to law enforcement that he used a .380 semi-automatic pistol in seven of the robberies with which he was charged; and he said that was the gun shown in one of the photos of the robbery associated with count nine. Evidence of these statements was introduced in the Government's case-in-chief.

This was sufficient evidence for a reasonable jury to conclude, beyond a reasonable doubt, that Robinson used a firearm during these robberies. And, we find meritless [Movant's] argument that no evidence presented in the Government's case-in-chief suggested that [Movant] knew Robinson would use a firearm during these robberies. During the Government's case-in-chief, the jury heard witness testimony and saw video evidence that [Movant] had participated in the previous Taco Bell robbery with Robinson and that firearms were used in that robbery. Indeed, [Movant] does not challenge his convictions for those crimes, charged in counts one and two. Because [Movant] had previously committed an armed robbery with Robinson, a reasonable jury could conclude that [Movant] knew that Robinson would use a firearm in subsequent robberies.

And, we find no manifest miscarriage of justice in upholding [Movant's] convictions on the bank robbery convictions that [Movant] now challenges (counts three, four, eight, ten, eleven, and twelve). Witnesses to several of the robberies testified that, in arriving at or leaving the robberies, Robinson entered or exited from the passenger side of the vehicle used in the crime. Several witnesses testified that the getaway vehicle was a red SUV, possibly a Chevrolet Blazer. When [Movant] was arrested, he was driving a red Chevrolet Blazer that belonged to Robinson or Robinson's wife. [Movant's] fingerprints were

5

on the demand notes used in the count four and twelve robberies.

Robinson testified that he committed each of these robberies, that he was driven to each of the robberies by another person, and that he split the proceeds of each of the robberies with that same person. Robinson also testified that the same person who drove him to the robberies wrote the demand notes used in the robberies. And, while Robinson denied that [Movant] was his accomplice in these crimes, he admitted that his accomplice went by the nickname J.T. and that [Movant] "probably" went by that nickname.

Witness Kevin Dunbar testified that he overheard a telephone conversation between Robinson and someone called J.T. in which Robinson discussed that Robinson and J.T. had used a third party's car to do something wrong and that the third party did not want anything to do with that. And, Dunbar testified that, on one occasion, he dropped [Movant] off at a hotel, and [Movant] introduced Robinson as his partner.

The record evidence supports the conclusion that [Movant] was Robinson's partner in the crimes—planning the robberies, driving the getaway cars, penning the demand notes, and splitting the proceeds. Therefore, we find no manifest miscarriage of justice in upholding [Movant's] convictions.

(Doc. 167 at 8-10 (citations omitted)).

## II.  **Movant's Claims**

Movant alleges that trial counsel provided ineffective assistance by

1.  failing to protect Movant's Sixth Amendment Confrontation Clause rights by allowing Det. Allen, a fingerprint analyst with the Cobb County Police Department ("CCPD"), to testify that Officer Bishop (formerly also of the CCPD), who did not testify, found two latent prints (belonging to Robinson) on the front of the February 12 demand note "and then he [Allen] came along and

6

found the '3rd' p[r]int," which testimony Movant argues was false because the record "clearly shows" that Allen found the first two prints himself;

2.  allowing Allen to testify that Eric Rich verified the third print, even though Rich was not at Movant's trial and his qualifications are unknown, in violation of (a) Movant's Confrontation Clause rights because Allen "testified to the 'finding' of another analyst" and (b) *Daubert*[3] and Fed. R. Evid. 702[4] "because [Allen's] finding was not verified" by a second qualified examiner;

3.  allowing Melissa Gische of the Federal Bureau of Investigation ("FBI") to testify "to the 'processing' aspect of the demand note for the 3-26-07 Suntrust robbery" despite there being "no evidence of who processed this note," in violation of *Daubert* and Fed. R. Evid. 702 "because she negated the analysis aspect of ACE-V [analysis, comparison, evaluation and verification] which requires a qualitative and quanti[ta]tive assessment of the processing technique applied," impossible here because "it is not established who[] processed the note";

4.  allowing into evidence "without proper authentication" a "tablet" "said to contain divided numbers similar to bank robbery proceeds";

---

[3] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), requires trial courts to screen out speculative, unreliable expert testimony.

[4] Federal Rule of Evidence 702 (Testimony of Expert Witnesses) provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

5.      not putting to the test whether Movant's consent to search was valid and not ensuring that Movant had been given the proper *Miranda*[5] warnings before being interrogated;

6.      allowing Det. Allen to testify that he found a third print on the February 12 demand note one year after the note was first processed, despite there being no latent prints or lifts to compare to Movant's fingerprints and despite Allen's failure to "give an assessment of the processing techniques," in violation of *Daubert* and Fed. R. Evid. 702;

7.      not objecting or moving for a mistrial or moving to strike the testimony of a "government witness who offered 'evaluation' without 'surrogate proof' ";

8.      not objecting to Det. Allen's testimony that deviated from the verification requirement of the ACE-V methodology used to identify fingerprints;

9.-10.      not objecting to Gische's testimony that deviated from ACE-V methodology, in particular by failing to present testimony as to who verified her work;[6]

11.      admitting Movant's guilt to the count 1 armed robbery;

12.      not moving for acquittal on all counts and not offering argument or evidence in support of Movant's motion for acquittal except as to count 1;

13.      not objecting properly to the delay in Movant's receipt of, and to the contents of, his Presentence Investigation Report ("PSR");

14.      not moving to sever his trial from Robinson's;

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966), prohibits the questioning of a person in custody about his suspected crimes without first advising him of his right to remain silent and his right to an attorney.

[6] In his supporting brief, Movant adds a claim 9a regarding the chain of custody for the March 26 demand note that Gische allegedly analyzed for fingerprints.  (Doc. 171-2 at 39 *et seq.*).

8

15.     not objecting to misleading jury instructions; and

16.     not requesting funds for the services of an expert and not preparing an adequate defense.

(Doc. 168 at 4-5, 7-11; Doc. 172 at 2-4; *see* Doc. 177 at 2-3). Movant has also raised *Brady* and *Giglio* claims and moved for a new trial based on newly discovered evidence (Doc. 171 at 1-19), as discussed below.

## III.   <u>Standard of Review:  Ineffective Assistance of Counsel</u>

A federal prisoner may file a motion to vacate his sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). It is well-settled that "to obtain collateral relief, a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982).  "[N]onconstitutional claims can be raised on collateral review only when the alleged error constitutes a 'fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure.' *Reed v. Farley*, 512 U.S. 339, 348 (1994)." *Burke v. United States*, 152 F.3d 1329, 1331 (11th Cir. 1998)

AO 72A
(Rev.8/82)

(citation altered and internal quotations omitted).

The Supreme Court set forth the standard for evaluating claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984); *see Dell v. United States*, 710 F.3d 1267, 1272 (11th Cir. 2013) (applying *Strickland* standard of review to ineffective-assistance-of-counsel claim raised in § 2255 motion). "An ineffectiveness claim . . . is an attack on the fundamental fairness of the proceeding whose result is challenged." *Strickland*, 466 U.S. at 697. The analysis involves two components, but a court need not address both if the movant "makes an insufficient showing on one." *Id.*

First, the court determines "whether, in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. The court "must be highly deferential" in scrutinizing counsel's performance and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. In other words, the movant "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (Internal quotations omitted). "Given the strong presumption in favor of competence, the [movant's] burden of persuasion—though the presumption is not

10

insurmountable—is a heavy one." *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (*en banc*). Second, the court determines whether counsel's challenged acts or omissions prejudiced the movant, i.e., whether "there is a reasonable probability"—one "sufficient to undermine confidence in the outcome"—that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

> Surmounting *Strickland*'s high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citations and internal quotations omitted).

"In reviewing whether counsel's performance was deficient, [courts in this circuit are to] give particular deference to counsel's decisions on matters of trial

11

strategy." *Perez v. United States*, 435 Fed. Appx. 820, 823 (11th Cir. 2011) (citing *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994); *Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengable.")).  " '[C]ounsel cannot be adjudged incompetent for acting in a particular way in a case, as long as the approach taken might be considered sound trial strategy.' " *Zakrzewski v. McDonough*, 455 F.3d 1254, 1258 (11th Cir. 2006) (quoting *Chandler*, 218 F.3d at 1314) (internal quotations omitted).

The burden of establishing prejudice under the *Strickland* test is "heavy where the [movant] alleges ineffective assistance in failing to call a witness because often allegations of what a witness would have testified to are largely speculative." *Sullivan v. Deloach*, 459 F.3d 1097, 1109 (11th Cir. 2006) (internal quotations omitted); *see also Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004) (" 'Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that *we will seldom, if ever, second guess*.' " (emphasis added) (quoting *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (*en banc*)); *see Thomas*, 46 F.3d at 1514 ("The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove

12

ineffectiveness of counsel." (internal quotations omitted)).

Likewise, a claim based on counsel's failure to properly cross-examine a prosecution witness is a difficult one to establish.

> Absent a showing of a single specific instance where cross-examination arguably could have affected the outcome of either the guilt or sentencing phase of the trial, a [movant] is unable to show prejudice necessary to satisfy the second prong of *Strickland*. Ineffective assistance . . . will not be found merely because other testimony might have been elicited from those who testified, though [the Eleventh Circuit has] found ineffective assistance where counsel failed to impeach the key prosecution witness with prior inconsistent testimony where the earlier testimony was *much more favorable to the defendant*. Though counsel may have performed deficiently in failing to impeach a witness, the defendant must still demonstrate that prejudice resulted from the deficient cross-examination.

*Broadwater v. United States*, 347 Fed. Appx. 516, 519-20 (11th Cir. 2009) (citation and internal quotations omitted); *see also Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001).

## IV.   **Discussion**

### A.   **Grounds 1-3, 6-10, 16:  The Expert Fingerprint Testimony**

Movant has presented lengthy arguments regarding the alleged discovery of his fingerprints on the February 12 and March 26 bank robbery demand notes.  (Doc. 171-1 at 34-66; Doc. 171-2 at 2-59).  He argues that the testimony of Allen and Gische about the prints does not qualify as expert fingerprint testimony for a number of

13

reasons, including (1) the questionable qualifications of each witness; (2) the mysterious circumstances surrounding Allen's eleventh-hour discovery of Movant's fingerprint on the back of the February 12 note, a year after the use of a developing agent that causes prints to fade over time; (3) the failure of the method used in identifying his fingerprints on each note to conform to the ACE-V methodology for fingerprint identification; (4) the failure of Gische to identify who processed the prints on the March 26 note and the processing method used; and (5) the absence of proof of the chain of custody for the March 26 note presented at trial to authenticate it as the same note recovered from the March 26 bank robbery.

Movant also claims that his Sixth Amendment Confrontation Clause rights were violated because neither Eric Rich, who allegedly verified Allen's identification of Movant's print on the February 12 note, nor the unknown person who processed the prints on the March 26 note nor the agent who verified Gische's fingerprint identification was called to testify. Movant asserts that allowing Allen's and Gische's testimony into the trial regarding the identification of Movant's fingerprints on the two demand notes without a serious challenge from trial counsel constituted ineffective assistance. (*See generally* Doc. 171-1 at 34-66; Doc. 171-2 at 2-59).

Movant states further that the two demand notes that allegedly contained his

fingerprints were critical pieces of evidence at his trial.  Nevertheless, trial counsel did

not hire a defense fingerprint expert as a counter weight to the testimony of the

fingerprint experts who testified for the government and to help counsel prepare a

more vigorous and probing cross-examination of the government experts on a range

of topics relevant to the proper methodology for fingerprint identification.  (Doc. 171-2

at 129-36).  According to Movant:

> An independent examiner would have been able to determine if [his]
> fingerprints were indeed on the demand note, also the independent
> examiner would have helped counsel to understand the process of
> fingerprint identification. This·understanding would have given counsel
> 'interknowledge' [sic] of the science of fingerprinting which would have
> resulted in an adequate defense. Counsel would have known the
> probability of a[] print retaining clarity after one year's time, or if it is
> even possible. The independent examiner would have relayed to counsel
> how processing is done, so the theory that <u>no one looked on the back</u> of
> the note would have prompted counsel to cross-examine not only
> vigorously, but with precise or 'scientific' questioning. Movant's counsel
> basically sat in trial and listened to a field of evidence in which he had no
> familiarity; a reasonable attorney/counsel would have moved for an ex
> parte hearing, so the court could determine if an independent examiner's
> services were applicable or needed for an adequate defense for the case
> at hand pursuant to U.S.C. § 3006A(e). It is below professional norms for
> counsel to take a case in which fingerprint evidence is relied on heavily
> by the government and not take one step to learn about the evidence
> himself or to get his own tests done by an examiner.

(*Id.* at 131-32).

Another judge in this Court has recently explained the use of fingerprint

identification evidence as follows:

> In *Daubert*, the Supreme Court "emphasized the district court's 'gatekeeping' role to ensure that scientific testimony is relevant and reliable before it is admitted as evidence." *Sciele Pharma, Inc. v. Brookstone Pharm., LLC*, No. 1:09-CV-3283-JEC, 2011 U.S. Dist. LEXIS 97216, at *6 (N.D. Ga. Aug. 30, 2011) (citation omitted) (quoting *Daubert*, 509 U.S. at 589-90). "In determining the admissibility of expert testimony under Rule 702, district courts must consider whether the expert can testify competently on the areas he intends to discuss, whether the expert's methodology is sufficiently reliable, and whether the expert's testimony, through the application of his scientific, technical, or specialized expertise, will assist the trier of fact to understand the evidence." *United States v. Jayyousi*, 657 F.3d 1085, 1106 (11th Cir. 2011) (citation omitted). In addition, the *Daubert* opinion identifies several factors that may be relevant in determining the admissibility of expert testimony under Rule 702:

>> (1) whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

> *Adams v. Lab. Corp. of Am.*, No. 1:10-cv-3309-WSD, 2012 U.S. Dist. LEXIS 13582, at *9 (N.D. Ga. Feb. 3, 2012) (citing *Daubert*, 509 U.S. at 593-94).

> "The *Daubert* inquiry is a flexible one, giving district courts great latitude

16

in determining which of the *Daubert* factors, if any, are appropriate in assessing the admissibility of expert testimony in a particular case." *Diaz*, 2008 U.S. Dist. LEXIS 27477, at *2 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) ("noting that '*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case.'")); *see also Adams*, 2012 U.S. Dist. LEXIS 13582, at *9. "[W]hether the *Daubert* factors are even pertinent to assessing reliability in a given case will 'depend[ ] on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *United States v. Reddy*, No. 1:09-CR-0483-ODE/AJB, 2011 U.S. Dist. LEXIS 68978, at *11 (N.D. Ga. Feb. 24, 2011), *adopted by* 2011 U.S. Dist. LEXIS 67187, at *9 (N.D. Ga. June 23, 2011) (second alteration in original) (quoting *Kumho Tire Co.*, 526 U.S. at 153 (internal marks omitted)); *see also United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005). Therefore, the court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152.

*Additionally, "Daubert hearings are not required." Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005) (citation and internal marks omitted); *see also United States v. Kyler*, 429 F. App'x 828, 830 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted) ("[A] formal *Daubert* hearing is not required in every case."). Rather, "[t]he decision of whether to conduct a Daubert hearing in a particular case is discretionary." *Abrams v. Ciba Specialty Chems. Corp.*, No. 08-0068-WS-B, 2010 U.S. Dist. LEXIS 19165, at *1 n.1 (S.D. Ala. Mar. 2, 2010) (collecting cases); *see also United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001) (per curiam). Thus, "[a]lthough the Court must ensure that expert testimony is reliable and admissible, there is nothing in *Kumho Tire* or *Daubert* that requires the Court to conduct a pre-trial evidentiary hearing if the expert testimony is based on well-established principles." *United States v. Cooper*, 91 F. Supp. 2d 79, 82 (D.D.C. 2000) (citing *United States v. Nichols*, 169 F.3d 1255, 1263 (10th Cir. 1999) ("pre-trial hearing not required because 'the challenged evidence does not involve any new

scientific theory and the testing methodologies are neither new nor novel'")). "'Accordingly, where expert testimony is based on well-established science, the courts generally have concluded that reliability problems go to weight, not admissibility.'" *Id.* (quoting 29 Charles A. Wright & Victor James Gold, Federal Practice and Procedure § 6266 (1st ed. 1982)).

*United States v. Campbell*, No. 1:11-cr-00460-AT-RGV, 2012 U.S. Dist. LEXIS 86799, at *10-14 & n.5 (N.D. Ga. April 19) (footnote omitted) (emphasis added) (citations altered or omitted) (noting "that 'there are instances in which a district court may determine the reliability prong under *Daubert* based primarily upon an expert's experience and general knowledge in the field.'" *Reddy*, 2011 U.S. Dist. LEXIS 68978, at *11 n.16 (citing *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1336 (11th Cir. 2010) (citation omitted))), *adopted by* 2012 U.S. Dist. LEXIS 86798 (N.D. Ga. June 22, 2012).

In *Campbell*, a government fingerprint expert prepared a report that described in detail the ACE-V methodology he used to identify the defendant's latent prints: (1) the analysis phase, in which he found "a sufficient quality and quantity of friction ridge detail in the fingerprints to individualize them"; (2) the comparison phase, in which he compared the lift prints with the rolled prints of the defendant on "three separate levels"; (3) the evaluation phase, "at which time he reached his conclusion as

18

to the identity of the fingerprints"; and (4) the verification phase, during which a "second examiner proceeded through the three phases of the identification process listed above and came to his/her own conclusion as to the identification of the fingerprints." *Id.* at *6-8, 19 (recommending that no *Daubert* hearing was necessary in that case).

*Campbell* made no mention of a report or proffered testimony of the second examiner who verified the analyst's results or of any agent who might have prepared the latent prints for analysis. *See Galiana v. McNeil*, No. 08-20705-CIV, 2010 U.S. Dist. LEXIS 82333, at *57 (S.D. Fla. July 5) ("Persuasive authority exists that the Confrontation Clause does not require an expert to have performed the actual laboratory work to permissibly testify with regard to conclusions he or she has drawn from the results of that laboratory work."),[7] *adopted by* 2010 U.S. Dist. LEXIS 82325

---

[7]*See McNeil*, 2010 U.S. Dist. LEXIS 82333, at *61-62, citing *United States v. Turner*, 591 F.3d 928, 930 (7th Cir. 2010), where a supervising chemist testified about the substances purchased from a defendant even though he had not performed the actual test on the substances. The supervisor, a senior chemist who headed the drug identification unit in a state crime laboratory, testified about the procedures employed in his laboratory for processing and testing substances, including the calibration of machines each day they were used and the use of blank samples to avoid contamination or carryover from previous testing. *Id.* He also described how substances were tested, and explained that each chemist's analysis was required to undergo a peer review. *Id.* at 930-31. Based on his peer review of the work of the chemist who had tested the sample connected with the defendant, including that other chemist's report, her handwritten notes, and the machine-generated data, the supervisor was able to reach an opinion about the nature of the substance connected to the defendant. *Id.* at 931. . . . [T]he court found no Confrontation Clause problem with allowing the government's expert witness to rely on information gathered and produced by a laboratory

19

(S.D. Fla. Aug. 12, 2010).

Detective McEntyre of the CCPD testified that his investigators discovered the two demand notes at issue here at bank robberies on February 12 and March 26 (Gov't Exs. 16-A and 14-A, respectively), and he identified them at trial by his name on the outside of the bag containing Exhibit 16-A and by his recollection of a photograph taken of Exhibit 14-A at the crime scene. (Doc. 146 (Trial Tr. II) at 30-36). McEntyre testified that he processed the February 12 note at the CCPD with Ninhydrin, a fixing agent that turns fingerprints purple, and a steam iron, to accelerate the chemical process by which prints become visible, and then hung the note up to dry. (*Id.* at 30-31 (noting that "Ninhydrin can possibly take days to actually react and sometimes weeks, in my experience, to show prints"), at 33-34). McEntyre testified that the March 26 note also had been processed, although he had not processed it. (*Id.* at 36).

Gische's experience and credentials as a fingerprint expert appeared to be more than sufficient and there was no winning objection to be made, and none was offered, to her being declared an expert in the field of fingerprint identification. (*Id.* at 59-63). Gische testified that she recognized the March 26 demand note (Gov't Ex. 14-A) by her initials on the back of the note. (*Id.* at 66). After explaining how she applied the

---

employee who did not testify. *Id.* at 932-33.

ACE-V methodology to the note, she testified that she had identified four of Movant's prints on the note. (*Id.* at 63-68; *see id.* at 70-71).

Movant's many claims on the fingerprint issue involve the failure of trial counsel to object to the testimony of the government experts due to the alleged inadequacy of their credentials or findings, his failure to cross-examine them vigorously enough, or his failure to object to their testimony about the findings or work of other agents or fingerprint experts who did not testify at Movant's trial.[8]  In short, these were all matters of trial strategy, and as the caselaw set forth above indicates, such matters are not to be second-guessed except in the most extreme circumstances. Such circumstances do not exist here.

For instance, Movant objects to the failure of his attorney to object to Det. Allen's testimony referring to a verification by Eric Rich of the fingerprint on the February 12 note.  Movant cites no cases, and the Court can find none *sua sponte*,

---

[8]In his reply brief, Movant emphasizes that he does not object to fingerprint identification in general, but only to the way it was conducted by the two fingerprint experts who claimed to have identified his prints on two separate demand notes because their testimony was insufficient regarding the analysis and verification phases of the ACE-V methodology, in large part because there was no testimony from the expert who verified the findings of either testifying expert or from the unknown agent who prepared the lift prints for Gische to analyze.  He also objects to the faulty chain of custody regarding the note that Gische analyzed, arguing that there is no proof that she actually analyzed a note taken from the March 26 bank robbery scene.  (Doc. 181 at 8-24; 54-61; 63-71).

21

finding that a fingerprint examiner's mere reference that his examination was verified pursuant to the ACE-V procedure violates the Confrontation Clause. Nevertheless, the Court assumes for purposes of this discussion that Rich's fingerprint verification was a testimonial statement pursuant to *Crawford v. Washington,* 541 U.S. 36, 61 (2004).[9]

The question remains whether it could have been a plausible trial strategy for counsel not to object. The Court finds that this could have been the result of a rational, tactical decision. At the outset, the lack of clear precedent on the applicability of the Sixth Amendment on this question at the time of trial is relevant and may have rationally contributed to a decision that the chance of success for an objection was unclear. And counsel could have rationally considered that an objection on this ground – successful or not – might only have caused the prosecution to actually call Eric Rich as a witness, in which case he might have explained his verification and his own credentials in far more detail than the brief reference at trial. In that circumstance,

---

[9] Not all forensic work by law enforcement experts constitutes testimonial hearsay, notwithstanding that it is necessarily conducted under the shadow of potential future court action. The Supreme Court, in cases decided mostly after Movant's trial, has distinguished between forensic reports prepared for the purpose of attempting to prove the guilt of a particular defendant at trial, which are generally testimonial in nature, and work conducted for the purposes of investigating and attempting to identify the perpetrators of a crime, which is generally not. *See Williams v. Illinois*, 132 S. Ct. 2221, 2242 (2012). Moreover, "[f]or violations of the Confrontation Clause, harmless error occurs where it is clear beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *United States v. Caraballo*, 595 F.3d 1214, 1229 (11th Cir. 2010) (internal quotations omitted).

22

Movant would be faced with the live testimony of not just one examiner but two examiners who the jury might find qualified. Counsel could have rationally considered that Movant was better off dealing with the testimony of only one live expert on this issue, who was subject to substantial impeachment.

Indeed, trial counsel extensively cross-examined Allen about the confusion regarding how many fingerprints had been discovered on the February 12 note, when they were discovered, and by whom. (*See* Doc. 146 at 116-21). A focus of this cross-examination was on what Movant clearly believes to be suspicious circumstances, in which the investigators somehow only found Movant's print on the note shortly before trial notwithstanding that it had been analyzed originally many months before. (*Id.*) It appears that counsel sought to impeach Allen specifically and the investigation generally with this line of questioning. By not objecting to Allen's brief reference to Rich, counsel may have helped ensure that the only witness on the issue of Movant's fingerprints on the February 12 note was one subject to this line of impeachment. Moreover, even if an objection had succeeded in excluding this testimony, that would have denied counsel the opportunity to highlight the supposedly late-discovered fingerprint to the jury as a suggestion of investigative incompetence (or worse). Counsel may have decided as a matter of trial tactics that the admission of this

23

evidence, on balance, helped Movant in this regard, especially if it was limited to the testimony of just Allen.

As for Gische's testimony, she did not even refer to the findings of another fingerprint expert. Instead, she described how she matched the fingerprints she was given on the February 26 note to Movant. (*See id.* at 66-71). She also testified that the February 26 note that was introduced into evidence as Exhibit 14-A had her initials on the back of the note, so she knew that it was the same note that she had examined to find Movant's prints. (*Id.* at 66). Movant provides no basis for this Court to find that counsel had a winning objection to make with regard to this testimony.

As for the failure of trial counsel to obtain a defense expert on fingerprint analysis, Movant offers nothing more than speculation as to what that hypothetical expert may have testified to. It may simply have been impossible to find one who would testify that the methodology used by Allen and Gische was anything less than the proper method to match lift prints to known fingerprints or that the matched prints did not belong to Movant. Movant has offered no real evidence to indicate otherwise except for his own beliefs as to what procedures should have been employed.[10] That

---

[10]It appears that Movant misunderstands the analysis phase of the ACE-V methodology. Analysis requires a determination of whether a lift print has sufficient qualitative and quantitative clarity to be used for identification, which determination may require consideration of any "noise" introduced

is not enough to establish that counsel was unconstitutionally incompetent for failing to procure and call a fingerprint expert.

Finally, even if counsel could be said to have acted deficiently with regard to his opposition to the prosecution's fingerprint evidence, Movant fails to surmount his burden to show actual prejudice. With the lack of clear precedent at the time of trial, it is not clear whether a Confrontation Clause objection would have been sustained. More generally, it is not evident that Allen's mere reference to Rich's out-of-court "verification" would have added any weight to the government's case above and beyond the jury's assessment of Allen's independent work and his credibility at trial. If the jury believed Allen, then it likely would have credited his own independent analysis, and Rich's "verification" would have been immaterial. If the jury disbelieved Allen or found him to be incompetent, then it would seem unlikely that the jury would nevertheless have credited his fingerprint examination merely because he conclusorily testified that another officer with unknown credentials "verified" it.    And this fingerprint evidence was only part of the evidence introduced against Movant. As the Eleventh Circuit found in sustaining Movant's convictions, the jury saw and heard

---

into the print by the processing of it. Nothing Movant cites establishes that the testifying expert must personally process the print.

25

witness testimony and other evidence that Movant committed other armed robberies with Robinson; Robinson and other witnesses testified that his accomplice in this robbery was "J.T." and that Movant went by that nickname; Movant was found driving Robinson's car that was used in the robbery; and Robinson was found in a hotel room rented in Movant's name. Movant cannot sustain his heavy burden to establish trial prejudice relating specifically to the introduction of the fingerprint testimony.

All of Movant's ineffective assistance claims regarding the fingerprint expert witness testimony therefore fail on both the performance and prejudice prongs of such claims.[11]

**B.    Ground 4:  Admission of the Tablet**

Movant next challenges trial counsel's failure "to object to the admission or authentication of the tablet," a notepad which allegedly contained calculations regarding the division between Movant and Robinson of the proceeds from one of the indicted bank robberies, and counsel's failure to "attempt[] to interview the agent

---

[11]Although Movant couches at least two of his claims in terms of alleged violations of the Sixth Amendment Confrontation Clause, he was required to raise these substantive claims on direct appeal and he may not raise them in a § 2255 absent a showing that entitles him to do so, which he has not made. *See McCoy v. United States*, 266 F.3d 1245, 1258 (11th Cir. 2001) ("A claim not raised on direct appeal is procedurally defaulted unless the petitioner can establish cause and prejudice for his failure to assert his claims on direct appeal.") Thus, the undersigned considers these claims on the merits only insofar as they relate to Movant's ineffectiveness of counsel claims.

26

who[] recovered the tablet." (Doc. 171-1 at 67-68).  Movant asserts that the agent who discovered the tablet did not testify at trial (noting that Agent Myers, who testified about the tablet, was not present during the search of his hotel room) and that there is no evidence that the two pages of calculations entered into evidence came from a tablet that could be tied to the defendants.  (*Id.* at 69-71).  He argues that because the "ledgers" are not business records they "are prohibited as testimonial evidence."  He also denies that they are admissible as the statements of a co-conspirator.  (*Id.* at 72-73).  Movant argues that because the prosecutor mentioned the ledgers twice in closing argument, trial counsel's failure to properly challenge the admission of the tablet was not harmless error.  (*Id.* at 78-81).

Movant fails to show any constitutional deficiency by counsel with respect to the admission of the "tablet" because there was no clear, winning objection to be made. The prosecution introduced the evidence through the testimony of FBI agent Myers, who testified that the tablet and two pages of writing within were recovered from the hotel room that Movant had rented and where Robinson had been found.  (Doc. 146 at 201-202).  This testimony provided at least arguable foundation for the authenticity

27

of the document.[12]  Contrary to Movant's argument, this tablet cannot be considered "testimonial" hearsay subject to exclusion under the Confrontation Clause.  It was a worksheet containing numbers, created as an apparent record of some activity, clearly not created for purposes of litigation or testimony.  At least Movant shows no facts suggesting that a valid Confrontation Clause objection could be made.

Moreover, the inculpatory force of the tablet evidence was so slight as compared to the other evidence against Movant that he cannot persuasively argue that the outcome of his trial would have been different had the tablet evidence been excluded.  The tablet contained no direct statements referring to any robbery or to Movant personally.  The apparent significance to the prosecution's case was summarized by Agent Myers as follows: "There are several numbers written on the sheets. In particular, on 48-C there is the number 2304, and it's divided by two.  And that is done

---

[12] As Agent Myers was not present for the search itself (Doc. 146 at 197), she presumably had no personal eyewitness knowledge of what was obtained during the search.  Nevertheless, she may have had some other arguably admissible basis for testifying that the materials were found in the hotel room.  Moreover, even if an objection could have been made as to lack of foundation or authenticity, it was not constitutionally defective for counsel to refrain from making such an objection here.  On this record, the prosecution appeared to have other alternative means of authenticating the exhibit, including by calling one of the three searching agents and/or by using contemporaneous records or notes of the evidence seized.  Whether to lodge a technical objection to the admission of an exhibit on foundational grounds, given the likelihood that a foundation could ultimately be established, is a quintessential tactical decision left to counsel's discretion, especially given the minor significance of this particular document.

several times on the sheet, dividing the [2304] . . . by two, which on this sheet comes up to 1152. . . . On . . . the last bank robbery the loss was $2,311." (Doc. 146 at 201-02). In other words, the government suggested that the fact that the 2,304 number was close to, although did not actually equal, the loss amount of the last robbery, and was divided in two, suggests that it reflected a record of what each Defendant was due to receive from that crime. Movant's trial counsel cross-examined Agent Myers got her to admit that she did not really know when the numbers were written there or what they meant, other than her speculation that 2,304 was a miscount of the $2,311 loss amount from the last bank robbery on March 26. (Id. at 215-19). This evidence was plainly not what the jury's verdict turned on. And counsel could have rationally calculated that – even if a winning objection could be made to the document's admission – Movant's defense could have been better off with the ability to highlight this weak and speculative aspect of the prosecution's case. This ground fails.

### C.    Ground 5:  Motion to Suppress

Movant challenges trial counsel's failure to move to suppress the consent Movant gave for a search of his hotel room without first being advised of his *Miranda* rights. (Doc. 171-1 at 82-84).

As background, on March 26, 2007, an Atlanta police officer spotted the red

29

Chevrolet blazer that belonged to Robinson or his ex-wife and that had been used as the getaway vehicle in at least two of the bank robberies.  With the help of other officers, he stopped the vehicle and detained Movant, who was driving the vehicle, after Movant told him that the vehicle was stolen.  (Doc. 146 at 176-82).  He asked Movant where he was living, and Movant replied at the Intown Suites on Piedmont Circle, at which point the officer contacted the FBI.  Several FBI agents then went to that location.  (*Id.* at 182-83).

An FBI agent testified that after Robinson was arrested in Movant's Intown Suites room the next day, he and another agent obtained from Movant a consent to search the room.  (Doc. 147 (Trial Tr. III) at 17-18 ("We met with [Movant,] identified ourselves, informed him of why we were there, asked him if he had rented room 463. He verified that he had rented 463.  We asked him if he would voluntar[il]y consent to a search of the room.  He accepted and he signed a form that we have called an FD26, consent-to-search form.")).

Movant states that he was in jail on a suspended license charge, after having been stopped because he was driving a vehicle suspected of being used in a recent string of armed robberies, when he was approached to sign a consent to search his hotel room and told that doing so would give him "a chance to present himself in [a]

30

good light, [whereas] a refusal [would] only make [him] look suspicious." (Doc. 171-1 at 87).  Noting that the search led to the discovery of a .380 caliber firearm allegedly used, and a baseball cap allegedly worn, in the bank robberies, as well as the aforementioned tablet containing numeric calculations (*id.* at 88), and that the prosecutor was able to tie Movant to the robberies by noting that his room was where the firearm was found and where Robinson was hiding out when the police came to arrest him (*id.* at 90), Movant argues that his trial counsel was ineffective for failing to test the circumstances under which the consent was obtained (*id.*).

The government argues that because Movant was not interrogated, his *Miranda* rights were not implicated, and the consent to search form that he signed after his arrest, even if invalid, would not have prevented the admission of the evidence seized from his hotel room because, under the theory of inevitable discovery, the evidence would have ultimately been recovered by lawful means. As Movant was in custody, the agents could have obtained a search warrant if he had refused consent.  Further, as they were arresting Robinson with probable cause in that very room, and Robinson was armed with a handgun, the agents could have lawfully entered the room as a search incident to arrest. (Doc. 177 at 15 (citations omitted)); *see United States v. Timmann*, 741 F.3d 1170, 1182-83 & n.7 (11th Cir. 2013) (noting that "evidence may be

31

admissible if the government inevitably would have discovered it without the aid of the unlawful police conduct, pursuant to [this circuit's] limited version of the 'inevitable discovery' rule[,]" and noting that this circuit does "not require absolute inevitability of discovery but simply a reasonable probability that the evidence in question would have been discovered other than by the tainted source" (internal quotations omitted)); *United States v. Dixon*, 491 Fed. Appx. 120, 122 (11th Cir. 2012) ("The inevitable discovery exception to the exclusionary rule permits admission of evidence that in fact resulted from an illegal search but would have been discovered without that illegal police action.").

Movant replies to this inevitable discovery argument that when he was arrested he was not a suspect in the bank robberies and the authorities had no information about where he was living, so that without the information about his hotel and room number coerced from him illegally, the authorities would not have discovered that information and would not have located Robinson in Movant's hotel room. He also notes that Robinson was arrested outside of the room, so there was no basis for a search of the room in a protective sweep. (Doc. 181 at 29-53).

"[T]here are exceptions [to the *Miranda* requirement, and a]mong those is the 'well-established routine booking exception,' under which a defendant's answers to

32

questions designed to elicit the information necessary to complete booking may be used against him, even if those answers turn out to be incriminating." *United States v. Brotemarkle*, 449 Fed. Appx. 893, 896 (11th Cir. 2011) (quoting *United States v. Doe*, 661 F.3d 550, 567 (11th Cir. 2011) (internal quotations omitted)).  The Eleventh Circuit has "held that a suspect's pre-*Miranda* warning responses to an officer's request for his address was admissible when there was no evidence that the question was intended to elicit an incriminating response." *Id.* at 896-97 (citing *United States v. Sweeting*, 933 F.2d 965 (11th Cir. 1991)).

Given that Movant told a law enforcement officer upon his initial arrest that he was living at the Intown Suites and that, apparently, a subsequent investigation revealed his room number there, Movant cannot show prejudice from the failure of trial counsel to challenge the consent to search form that Movant signed allowing the search of his hotel room.  First, the officers' entry into the room was inevitable.  Plainly, the police had probable cause to obtain a warrant to search the room where Robinson, a robbery suspect whom they had just arrested and who they believed had used a handgun, was residing.  Even if Robinson was arrested outside the room itself, the fact that the gun was not recovered during the arrest might also have justified a warrantless search on public safety grounds to find the gun, especially where the police

33

knew that the room was rented in someone else's name.  *See, e.g., United States v. McConnell*, 903 F.2d 566, 569 (8th Cir. 1990) (probable cause that an arrestee kept a loaded firearm in hotel room justified warrantless search on public safety grounds). Moreover, Movant presents no facts to suggest that any challenge to his consent-to-search would have been successful, given the testimony that he executed a written FBI consent-to-search form, by which he acknowledged the voluntariness of his consent in writing.  (*See* Gov't Ex. 41).  Movant also cannot show deficient performance on these facts, where he fails to show that his counsel was aware of any specific evidence that would have rebutted the voluntariness of his written consent to search.  Movant can show neither deficient performance nor prejudice on this claim.

### D.    **Ground 11:  Trial Counsel's Admission of Guilt**

Movant alleges that the only evidence against him with respect to the Taco Bell armed robbery was his counsel's admission that he committed it.  (Doc. 171-2 at 60). Movant argues that trial counsel's strategy—acknowledging that Movant committed the Taco Bell robbery because there was no evidence that the robbery affected interstate commerce, so that a conviction on the Taco Bell counts in federal court would not "stick" anyway, in order to disassociate Movant from the bank robberies—was so great an error that it deprived Movant of the effective assistance of

34

counsel, especially after Movant told counsel "repeatedly that he had nothing to do with any of the robberies." (*Id.* at 60-61).  Movant argues that trial counsel's theory, that the government could not meet its burden of demonstrating an effect on interstate commerce to sustain a conviction in the Taco Bell robbery, was completely misguided and any competent counsel would have known this.  This mistake was compounded by the fact that the government used Movant's and Robinson's participation and use of firearms in the Taco Bell robbery to argue that Movant knew that Robinson would use a firearm in the bank robberies as well, even though Movant never entered any of the banks that were robbed.  (*Id.* at 62-68).

The evidence of Movant's commission of the Taco Bell robbery was overwhelming, including a clear photo of Movant and Robinson in the restaurant shortly before the robbery took place (Gov't Ex. 2B) and a videotape of the robbery itself (Gov't Ex. 1).  As trial counsel indicated in his opening statement:

> [T]he evidence that we expect to come before you today during the trial of this case will show you this: that [Movant] was at the Taco Bell on February the 8th of 2007. You will see a video and it's going to show that [Movant] did in fact take the money from the Taco Bell on February the 8th of 2007. There's no dispute in that. But where the dispute comes is that the government wants you to believe that [Movant] participated in seven other bank robberies. [Movant] did not participate in any bank robbery. The evidence will show you this.

35

(Doc. 145 (Trial Tr. I) at 16).

Trial counsel's insistence that Movant was innocent of the Taco Bell robbery may well have backfired and tainted Movant's entire defense.   It is a natural subject of trial tactics for counsel to pick battles, that is, pick the issues that stand the most chance of success and attempt to gain credibility with the court or jury by not contesting those points that lack a chance of success.  The court will not second guess trial counsel's reasonable strategy to deflect guilt away from Movant with respect to the bank robberies by admitting it with respect to the Taco Bell robbery.  *See, e.g., Zakrzewski*, 455 F.3d at 1258.  This claim also fails.

### E.    Ground 12:  Motion for Judgment of Acquittal

Next, Movant argues that trial counsel was ineffective for failing to present any argument as to the insufficiency of the evidence to convict Movant on counts 2, 5 and 8-12, and he presents the arguments that he claims counsel should have made to this Court in support of a motion for judgment of acquittal.  Movant notes that other than presenting the useless argument regarding the effect on interstate commerce that trial counsel made on count 1, counsel merely adopted the arguments that counsel for Robinson presented on counts 2, 5, 6, 7 and 9.  (Doc. 171-2 at 69-92).

As noted above, Movant and Robinson moved for a judgment of acquittal only

on firearm counts 2, 5, 7 and 9 and robbery counts 1 and 6 (and not on robbery counts 3, 4, 8, 10, 11 and 12), and they argued insufficiency of the evidence only on the four firearm counts and robbery count 6 (and not on robbery count 1—the Taco Bell robbery—for which they argued an insufficient nexus with interstate commerce to support the charge).  Movant and Robinson were acquitted on counts 6 and 7.  On appeal, Movant did not challenge his convictions on counts 1 and 2.  The Eleventh Circuit therefore reviewed *de novo* only his convictions on counts 5 and 9, applying a sufficiency of the evidence standard.  Because Movant had not moved in this Court for a judgment of acquittal on counts 3, 4, 8, 10, 11 and 12, the Eleventh Circuit reviewed those robbery convictions using a less demanding "manifest miscarriage of justice" standard.  (*See* Doc. 167 at 5-7, 11 n.2).

"[I]t is not professionally unreasonable for a lawyer to fail to pursue issues which have little or no chance of success, and a criminal defendant is not prejudiced by counsel's failure to pursue non-meritorious claims or those on which they likely would not have prevailed." *Nix v. United States*, 12-81106-CIV, 09-80015-CR, 2013 U.S. Dist. LEXIS 168018, at *10-11 n.3 (S.D. Fla. July 19),[13] *adopted by* 2013 U.S.

---

[13]For support, the Magistrate Judge in *Nix* cited

*Strickland*, 466 U.S. at 690 ("counsel is strongly presumed to have rendered

Dist. LEXIS 168021 (S.D. Fla. Aug. 23, 2013). The Eleventh Circuit has ruled, after *de novo* review of Movant's count 5 and 9 firearm convictions, that this Court did not err in denying his motion for judgment of acquittal on those counts. Other than rehashing the trial evidence that the jury, this Court and the Eleventh Circuit found sufficient to support his convictions, Movant has offered no argument to throw these conclusions into doubt. It is also clear from the tenor of the Eleventh Circuit's review of those robbery convictions that Movant did not challenge via a motion for judgment of acquittal, as well as its discussion of the evidence supporting Movant's convictions on counts 1 and 2, that a motion for judgment of acquittal on the remaining robbery counts, based on the alleged insufficiency of the evidence, more likely than not would have failed. As a defense attorney is not required to waste the Court's time with

---

adequate assistance and made all significant decisions in the exercise of reasonable professional judgment"); *Knowles v. Mirzayance*, 556 U.S. 111 (2009) (the law does not require counsel to raise every available non-frivolous defense); *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001) (counsel is not ineffective for failing to raise a non-meritorious objection); *United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992) (failure to raise meritless issues cannot prejudice a client); *Card v. Dugger*, 911 F.2d 1494, 1520 (11th Cir. 1990) (counsel is not required to raise meritless issues); *Iron Wing v. United States*, 34 F.3d 662, 665 (8th Cir. 1994) (movant not prejudiced by counsel's failure to file motion to suppress that would have been denied); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994)(counsel's failure to make futile motions does not constitute ineffective assistance); *United States v. Hart*, 933 F.2d 80, 83 (1st Cir. 1991) (counsel is not required to waste the court's time with futile or frivolous motions).

*Nix*, 2013 U.S. Dist. LEXIS 168018, at *11-12 n.3.

frivolous motions in order to provide effective assistance, trial counsel here was not ineffective for failing to file a motion challenging the sufficiency of the evidence on the bank robbery charges of which Movant was convicted. This claim also fails.

### F. **Ground 13: Sentencing**

Movant "is steadfast in his assertion that he did not have the <u>opportunity</u> to read and consult with counsel concerning the pre-sentence memorandum." (Doc. 171-2 at 94). He argues that because he was afforded insufficient time to read his PSR and consult with his trial counsel, his sentence was based on "false information and false assumptions." (*Id.* at 95). Movant asserts that there is no evidence to support the two-level sentencing enhancement he received for making one of the Taco Bell robbery victims get on the ground and then get back up to unlock the cash register. (*Id.* at 96-98). Movant states that this Court did not consider his objections, as required by Fed. R. Crim. P. 32(c)(1), but instead "either summarily adopted the findings of the [PSR] or simply declared that the enhancement in question was supported by a preponderance of the evidence." (*Id.* at 98). Movant attributes his failure to present many of his objections to the Court "to counsel not discussing the [PSR] with him." (*Id.* at 99). He also faults the Court for failing to allow both his counsel and himself 10 days to review the PSR for factual errors, as required by U.S.C. § 3552(d), which failure

39

Movant asserts should have prompted counsel to move for a mistrial based on a due process violation. (*Id.* at 99-100). Movant asserts that he was prejudiced at sentencing by counsel's deficient performance in failing to hold the Court to the standard of Fed. R. Crim. P. 32(c)(1) and thereby allowing Movant to be "sentenced upon unresolved and uncontested factual issues" and for failing to consult with Movant regarding the factual inaccuracies in the PSR. (*Id.* at 99, 101-02).

Although Movant claims that he was prejudiced at sentencing because of factual inaccuracies in the PSR, as noted above, he mentions only one – whether there was evidence in the record to support an enhancement for ordering a Taco Bell robbery victim to get on the ground and then to get up and unlock the cash registers and safe. He acknowledges, however, that trial counsel did object to this enhancement. (*Id.* at 96-97, 99; *see* Doc. 151 (Sent. Hr'g Tr.) at 5-9).[14] As Movant cannot show deficient

---

[14]Trial counsel also objected that although he had received the PSR in April, well ahead of the June 19, 2008 sentencing hearing, Movant himself had received it 8 days before the hearing, not 10 days as required by statute. (Doc. 151 at 1-4). Noting the numerous postponements of the hearing, the Court proceeded with sentencing anyway (*id.* at 2-4) and overruled as follows Movant's objections to the sentencing enhancements related to his use of a firearm at the Taco Bell robbery and his physical restraint of a Taco Bell employee:

> You know, to say that we're enhancing [Movant] for brandishing really doesn't reflect what we're doing, because under that provision of the sentencing guidelines he could be enhanced for up to five levels if a firearm was brandished. And really the probation officer only enhanced him three points for using it or possessing a dangerous weapon. And, frankly, you know, under this he could be increased five points if Mr. Robinson possessed the firearm.

performance for trial counsel's failure to object to the sentencing enhancements he received – when counsel did in fact object to the specific enhancement Movant complains about – and he has offered no other basis for finding trial counsel ineffective with respect to his sentencing on the robbery charges, this claim also fails.

### G.   Ground 14: Severance

Movant next argues that counsel was ineffective for "not filing a motion to

---

. . . .

Well, I appreciate your argument, Mr. Mack [Movant's trial counsel]. But if it wasn't . . . Mr. Robinson, that pretty much leaves [Movant as the one who physically restrained a Taco Bell employee], and [that Taco Bell employee's co-worker who testified] didn't know [Movant's] name to call him by name. So I think the enhancement is appropriate.

(Doc. 151 at 6, 9). One of the prosecutors summarized the trial evidence regarding the restraint enhancement as follows:

If you will recall, [the Taco Bell witness] testified that when she was down on the ground and Mr. Robinson had the gun to her, she heard [her Taco Bell co-worker] say, here, take the keys, and [Movant] said, no, you get up, you unlock the register. And as they come around, [the other prosecutor] showed the jury in the video where you see [Movant] place the firearm, I believe, into his pocket as he's going to empty one of the registers while [the Taco Bell employee] is . . . unlocking the registers for him.

(*Id.* at 8; *see* Doc. 145 at 29-33 (Taco Bell employee's description of events, including the fact that each robber had a firearm and one of them brandished his firearm in her presence)). Because Movant claimed that trial counsel had not conferred with him in any meaningful way about the two dozen or so objections he had to the PSR, The Court allowed Movant to present some of those objections himself, but when it became apparent that he was objecting to the facts underlying his convictions and not to those relevant to his sentencing calculations, the Court declined to allow him to enumerate each objection. (Doc. 151 at 9-17).

severe [sic.] [his] trial . . . [from the trial of his] co-defendant (Robinson), because the

evidence against Robinson prejudiced him, the evidence against [Movant] was weak

and circumstantial, [and] the evidence against Robinson cause[d] a 'spill-over effect'

which deprived [him] of a fair trial." (Doc. 171-2 at 103).

> Robinson's defense theory was that he did all of the robberies except for
> one (Wachovia Bank, Count 6), and that he did not use a real gun.
> [Movant's] defense theory was that he committed an armed robbery
> (Count 1, see argument in brief) but he did not do any of the bank
> robberies and had no participation or knowledge at all [as] to counts 2-12.
> It is obvious that the jury did not believe Robinson's fake gun theory, he
> changed his story many times prior to trial and the prosecutor
> high-lighted this point to the jury in closing argument.

(*Id.* at 105-06 (citations omitted) (noting that Robinson flip-flopped on the witness

stand as to whether he knew a J. T. and whether Movant was the J. T. who participated

in the bank robberies and also noting that Robinson was arrested in Movant's hotel

room with a real firearm in his possession)).  Movant argues that it was not a

reasonable trial strategy for counsel to allow Movant to be tainted with the

inflammatory testimony and evidence against Robinson. (*Id.* at 107).

In his reply brief, Movant notes that Robinson's prior identification of Movant

as his accomplice, J. T., came out during the cross-examination of Robinson, even

though Robinson denied that Movant was the accomplice at trial.  Movant argues that

42

a severance most likely would have meant that Robinson would not have testified at

Movant's trial, eliminating crucial evidence against him, leaving only circumstantial

and weak evidence for the jury to consider.  He also attacks the admissibility of the

results of Robinson's post-arrest interview because Robinson's *Miranda* rights

allegedly were violated.  (Doc. 181 at 87-130).

> The controlling caselaw provides as follows:
>
> Generally, . . . persons indicted together should be tried together. *United States v. Cobb*, 185 F.3d 1193, 1196 (11th Cir. 1999) (citation omitted); *United States v. Cassano*, 132 F.3d 646, 650-651 (11th Cir. 1998).  This is particularly true in conspiracy cases. *United States v. Baker*, 432 F.3d 1189, 1236 (11th Cir. 2005). Severance of co-defendants' trial may be granted if a single trial would prejudice a defendant. Fed. R. Crim. P. 14(a). However, mutually antagonistic defenses are not per se prejudicial such that severance is required. *Zafiro v. United States*, 506 U.S. 534, 537 (1993).
>
> In order to be entitled to severance pursuant to Rule 14(a), a defendant must meet the heavy burden of showing that a joint trial will result in "specific and compelling prejudice." *United States v. Liss*, 265 F.3d 1220, 1228 (11th Cir. 2001). "Compelling prejudice occurs when the jury is unable to separately appraise the evidence as to each defendant and render a fair and impartial verdict." *Id.* (citation omitted.)

*Houston v. United States*, No. 8:12-CV-561-T-24TBM, 8:09-CR-379-T-24TBM, 2014

U.S. Dist. LEXIS 17989, at *21-23 (M.D. Fla. Feb. 12, 2014) (holding that counsel

was not ineffective for failing to seek a severance because the "defenses were not so

antagonistic to one another as to create undue, compelling prejudice").

Movant argues that he was prejudiced by the inflammatory testimony and evidence against Robinson, but the same evidence to establish the commission of the indicted crimes would likely have been introduced at a trial of Movant alone. Movant's suggestion that Robinson would not have testified at Movant's trial is speculative, as the prosecution may simply have tried Robinson first and then compelled him to testify in a subsequent trial against Movant. Moreover, both Robinson and the agent to whom Robinson gave his initial statement about his accomplice were subject to cross-examination at trial by Movant's attorney. Also, whatever Robinson initially stated to officers about his accomplice's identity, Robinson denied on the stand that it was Movant. Most basically, counsel may have rationally calculated that Movant's trial chances were improved in a joint trial because there was clearly more evidence in the record about Robinson. The jury may have contrasted the relative strength of the evidence against Robinson against the lesser evidence against Movant, and any need for compromise within the jury room may have resulted in a decision to treat Movant more favorably. Or at least counsel could have reasoned these things. For all of these reasons, Movant has not established "compelling prejudice" or deficient performance arising from his joint trial, and this

44

claim fails.

### H.   <u>Ground 15:  Jury Instructions</u>

Movant states that when the jury during its deliberations inquired of the Court about the elements of an 18 U.S.C. § 924(c) firearm conviction, the Court referred the jury to the pattern instruction on aiding and abetting, allowing the jury to convict Movant on three firearm counts without proof of all the elements of those counts, and Movant's trial counsel had "nothing further" to say on the matter when the Court asked for input on the Court's response to the jury's note of inquiry.  (Doc. 171-2 at 109-111 (noting that the jury asked whether, if it believed that Robinson had a real gun and also believed that Movant knew that Robinson had a real gun, those two conclusions made Movant "guilty of those [firearm] charges (2, 5 & 9) (Aiding & Abetting)")).

Movant argues that counsel did not make sure that the jury understood that it could not convict Movant of aiding and abetting a § 924(c) crime merely because it believed that Movant had aided and abetted the underlying violent felony unless it also found that Movant possessed the "specific intent to aid the firearms crime."  (*Id.* at 114-15).  Movant notes that the jury was obviously confused about what was required to convict him of aiding and abetting on the § 924(c) charges and argues:

It is obvious from the record that counsel's performance fell below an

45

objective standard of reasonableness. (1) during the most critical time of trial (deliberations) counsel did not even bother to view the note the jury sent to the judge, even when the judge openly stated that she can't remember exactly what it said. (2) Counsel never moved for an instruction on 924(c)(l) aiding and abetting and conspiracy liability, although by law defendant is supposed to have one . . . .

(*Id.* at 127).

The Supreme Court of the United States recently "clarified the proof necessary for the intent element of aiding and abetting a section 924(c) violation—i.e., the defendant's knowledge that a co-conspirator will carry a gun."[15]  *United States v. Mack*, No. 12-16602, 2014 U.S. App. LEXIS 14087, at *37 (11th Cir. July 24, 2014) (quoting *Rosemond v. United States*, 134 S. Ct. 1240, 1249 (2014)).

"[The d]efendant's knowledge of a firearm must be advance knowledge"—that is, knowledge at a time when the accomplice "can attempt to alter [the] plan, . . . withdraw from the enterprise[, or] go ahead with his role in the venture." An accomplice's knowledge of "a

---

[15]Section 924(c)(1)(A) defines Movant's firearm crimes of conviction as follows:

> [A]ny person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime– . . .
>
> > (ii)    if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; . . . .

Section 924(c)(1)(C) requires a 25-year sentence for any subsequent conviction.

46

> confederate's design to carry a gun" is not "advance" if it does not afford
> him "a realistic opportunity to quit the crime."

*Id.* (citation omitted) (noting that the Supreme Court "concluded that the district court's jury instructions were erroneous because they did not direct the jury to determine when [the defendant] obtained the requisite knowledge and to decide whether [he] knew about the gun in sufficient time to withdraw from the crime").

The Court here instructed the jury as follows regarding aiding and abetting:

> The guilt of a Defendant in a criminal case may be proved without evidence that the Defendant personally did every act involved in the commission of the crime charged. The law recognizes that, ordinarily, anything a person can do for one's self may also be accomplished through direction of another person as an agent, or by acting together with, or under the direction of, another person or persons in a joint effort.

> So, if the acts or conduct of an agent, employee or other associate of a Defendant are willfully directed or authorized by that Defendant, or if a Defendant aids and abets another person by willfully joining together with that person in the commission of a crime, then the law holds that Defendant responsible for the conduct of that other person just as though the Defendant had personally engaged in such conduct.

> However, before any Defendant can be held criminally responsible for the conduct of others it is necessary that the Defendant willfully associate in some way with the crime, and willfully participate in it. Mere presence at the scene of a crime and even knowledge that a crime is being committed are not sufficient to establish that a Defendant either directed or aided and abetted the crime. *You must find beyond a reasonable doubt that any Defendant was a willful participant and not merely a knowing spectator.*

The word "willfully" as that term has been used in these instructions, means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is with bad purpose either to disobey or disregard the law.

(Doc. 101 at 14-15 (emphasis added); *see* Doc. 148 (Trial Tr. IV) at 84-85).

During jury deliberations, the jury sent the Court the following note:

If we believe that Robinson used a real gun in Counts 2, 5 & 9 — And we believe that [Movant] knew Robinson had a gun — Does that make [Movant] guilty of those charges? (2, 5 & 9) (Aiding and Abetting)

(Doc. 172-1 at 20).  The Court responded:

I would refer you to the aiding and abetting charge . . . specifically the portion that knowledge <u>alone</u> is not sufficient.  You must find a defendant was a willful participant and not merely a <u>knowing</u> spectator.

(*Id.* at 60).  By the time trial counsel arrived in the court room, the Court had "sent the note back in," which the Court described as "generally asking whether the fact that [the jurors] believed [Movant] had knowledge of Robinson's possession of a gun, and they specifically referred to counts . . . two, five, and nine, if that made him guilty."  (Doc. 148 at 104).  The Court informed trial counsel that it had directed the jury to the aiding and abetting charge, which the jurors had with them in the jury room, "and specifically that portion of the charge that dealt with knowledge."  (*Id.* at 104-05).  The Court asked counsel if there was anything he would like to add, and he responded, "Nothing

48

further." (*Id.* at 105).

In his reply brief, Petitioner argues that his conviction for aiding and abetting a § 924(c) charge required that the jury find that he "took some affirmative action to facilitate or encourage the use or carrying of a firearm." (Doc. 181 at 132). As stated below, this argument is misplaced.

Here, the evidence, the jury instruction on aiding and abetting, and the exchange of notes between the jury and the Court during deliberations all suggest with little room for doubt that the jury (1) understood that to convict Movant of the firearm counts it must find that he *willfully* participated in crimes of violence that involved the use of a firearm and (2) concluded that Movant knew about the intended use of a firearm in the robberies "in sufficient time to withdraw from the crime." *See Mack*, 2014 U.S. App. LEXIS 14087, at *37. And " '[j]ury instructions are subject to harmless error review.' " *United States v. Dickerson*, No. 13-11873, 2014 U.S. App. LEXIS 9705, at *4-5 (11th Cir. May 27, 2014) (quoting *United States v. Webb*, 655 F.3d 1238, 1249 n.8 (11th Cir. 2011), and concluding that jury instruction, which may have misstated the elements of defendant's crime of conviction, was at most harmless

AO 72A
(Rev.8/82)

error because there was sufficient evidence to satisfy all of the elements of the crime).[16]

Even if counsel should have demanded to see the actual notes rather than rely on the Court's rendition of them from memory, there is no reasonable likelihood that the outcome of Movant's trial on the firearm counts would have been different had counsel done so.  It was reasonable for the jury to conclude that Movant knew, far enough ahead of time to withdraw from his criminal enterprise with Robinson, that Robinson had used and might well again use a firearm in the robberies charged against him, robberies in which Movant willfully participated at least by serving as a getaway driver, if not by also preparing the demand notes.  This ground also fails.

## I.     *Brady* **and** *Giglio* **Claims**

Movant also asks the Court to vacate his judgment of conviction because, he alleges, the government withheld exculpatory evidence from the defense and solicited perjured testimony or failed to correct that testimony after learning it was false.  (Doc. 171 at 1-2).   Movant argues that although Allen and Gische testified that his fingerprints were on the demand notes for the February 12 and March 26 bank

---

[16]Movant's citation to *United States v. Bancalari*, 110 F.3d 1425, 1429-30 (9th Cir. 1997), holding that "to be guilty of aiding and abetting under § 924(c), the defendant must have 'directly facilitated or encouraged the use' of the firearm and not simply be aware of its use" (Doc. 171-2 at 114), is unavailing because there is no evidence that that test was employed in this Circuit before the Supreme Court in *Rosemond* stated the test differently.

50

robberies, the government withheld evidence that "there were **no lift prints** of [Movant] in this case." (*Id.* at 4).

Movant notes that the government's theory of the case was that because his fingerprints were found on the notes used in the first and last bank robberies in the alleged spree, he was guilty of participating in all of the bank robberies in that spree. Movant contends that he attempted to obtain copies of his lift prints both from the CCPD and the FBI but was told in each case that none could be found.  (*Id.* at 5-6). Movant contends that during his trial the government never provided copies of the prints themselves but only the expert reports regarding the alleged prints.  (*Id.* at 6-7). He claims a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), which requires the government to reveal arguably exculpatory evidence to the defense in a criminal trial if the defense could not, via reasonably diligent effort, obtain that evidence on its own, and of *Giglio v. United States*, 405 U.S. 150 (1972), which extends the *Brady* rule to testimony that the government knows or learns is false.  Movant contends that Det. Allen's testimony that he found Movant's finger print on the February 12 demand note one year after the fact is false and the prosecution knew it to be false.  (Doc. 171 at 7-9).  Movant claims likewise for Gische's testimony that she found his thumb prints on the March 26 demand note.  (*Id.* at 12-13).

Movant relies on a response to his Freedom of Information Act ("FOIA") request to the FBI indicating that "[n]o lift prints were located" in researching his request. (Doc. 187-1 (Decl. of David M. Hardy) at 10). The declaration also indicates, however, that "[t]he lift images in [Movant's] case were taken and processed by the [CCPD] rendering any processing by the FBI unnecessary. Additionally, it is the standard operating procedure of the Latent Print Operations Unit ('LPOU') not to conduct any further processing on images that have already been processed by another agency." (*Id.* at 8-9). The declaration further notes that the LPOU "did find friction ridge impressions pertaining to [Movant's] case. The LPOU forwarded two photographs of friction ridge impressions that were located on a demand note used during one of the robberies[,]" which photographs were released to Movant on July 7, 2011. (*Id.* at 10).

Movant claims in his second reply brief that the responses to the FOIA requests that he sent to the CCPD and the FBI reveal that neither agency retained a copy of the February 12 and March 26 demand notes or his lift prints allegedly discovered on those notes. He argues therefore that the government knew that the testimony of Allen and Gische was false because the fingerprint matches about which they testified did not exist. (Doc. 188 at 23-37).

52

Movant's *Brady* and *Giglio* claims are without merit.  Movant fails to show that the government withheld evidence during his trial, or elicited or accepted perjured testimony.   As the trial evidence recounted above amply demonstrates, the government's fingerprint experts testified about lift prints taken from evidence gathered by the CCPD during its investigation of two of the bank robberies.  Nothing about the FOIA responses or other correspondence cited by Movant suggests that these CCPD prints never existed.  To the contrary, the FBI responses indicated that CCPD took and lifted prints.  Movant obtained copies of certain prints.  To the extent copies of other prints were not maintained, Movant does not establish that this itself was a *Brady* or other violation.  To the extent Movant suggests that CCPD or others are lying in their responses, that is nothing more than speculation and does not warrant relief.

**J.    Motion for a New Trial**

In the alternative, Movant asks for a new trial based on the newly discovered evidence revealing that there are no latent prints belonging to him on the February 12 and March 26 demand notes, no established chain of custody for the March 26 note and no evidence of processing for the February 12 note.  (Doc. 171 at 16).

To succeed on a motion for a new trial based on newly discovered

53

> evidence, the movant must establish that (1) the evidence was discovered after trial, (2) the failure of the defendant to discover the evidence was not due to a lack of due diligence, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material to issues before the court, and (5) the evidence is such that a new trial would probably produce a different result. *United States v. Gates*, 10 F.3d 765, 767 (11th Cir. 1993), *modified on reh'g in part*, 20 F.3d 1550 (11th Cir. 1994) (citation omitted). "The failure to satisfy any one of these elements is fatal to a motion for a new trial." *United States v. Lee*, 68 F.3d 1267, 1274 (11th Cir. 1995) (citation omitted).

*Mack*, No. 12-16602, 2014 U.S. App. LEXIS 14087, at *63-64. Movant fails to meet the most basic of these requirements—he has not discovered any new evidence. For that reason and for the reasons stated elsewhere in this Report, Movant is not entitled to a new trial.

## V.     Certificate of Appealability

A federal prisoner must obtain a certificate of appealability (COA) before appealing the denial of a motion to vacate. 28 U.S.C. § 2255(d); 28 U.S.C. § 2253(c)(1)(B). A COA may issue only when the movant makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard is met when "reasonable jurists could debate whether (or, for that matter, agree that) the [motion to vacate] should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack*

54

*v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotations omitted).  A movant need not "show he will ultimately succeed on appeal" because "[t]he question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Lamarca v. Sec'y, Dep't of Corr.*, 568 F.3d 929, 934 (11th Cir.) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 337, 342 (2003)).

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, . . . a certificate of appealability should issue only when the prisoner shows both that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Jimenez v. Quarterman*, 555 U.S. 113, 118 n.3 (2009) (internal quotations omitted) (citing *Slack*, 529 U.S. at 484).  Although *Slack* involved an appeal from the denial of a 28 U.S.C. § 2254 petition, the same standard applies here.  *See Jones v. United States*, 224 F.3d 1251, 1254 (11th Cir. 2000) (applying *Slack* standard in § 2255 case).

Because Movant has not raised a claim of arguable merit regarding the effectiveness of his trial counsel's representation or his *Brady* and *Giglio* claims, a COA is not warranted here.

## VI.   <u>Conclusion</u>

For the foregoing reasons, **IT IS RECOMMENDED** that the Court **DENY**

Movant's 28 U.S.C. § 2255 motion (Doc. 168); **DENY** his motion for a new trial (Doc. 171); **GRANT** *nunc pro tunc* his motion to waive strict compliance and for liberal construction of his pleadings (Doc. 172) and his motions for an extension of time to file his reply briefs (Docs. 178, 179); **DENY as moot** his motions for the Court's attention (Docs. 175, 180); **DISMISS** this action; and **DENY** Movant a certificate of appealability.

The Clerk is **DIRECTED** to terminate the referral to the Magistrate Judge.

**SO RECOMMENDED** this 19th day of August, 2014.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)